Argued and submitted January 10, accused suspended from practice of law for one year, effective 60 days from date of decision March 8, 2007

# In re Complaint as to the Conduct of

# IAIN LEVIE,

*Accused.*

## (OSB 04-97; SC S53311)

154 P3d 113

Iain Levie, Portland, filed the briefs for himself.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The issue in this lawyer disciplinary proceeding is whether the accused, in the course of representing a client, violated various provisions of the former Code of Professional Responsibility:[1] DR 1-102(A)(3) (dishonesty, fraud, deceit, or misrepresentation); DR 7-102(A)(5) (knowingly making false statement of law or fact while representing his own or a client's interests); DR 7-106(A) (disregarding ruling of a tribunal); DR 1-102(A)(4) (conduct prejudicial to administration of justice); and DR 5-101(A)(1) (continuing employment involving financial conflict). A trial panel found the accused guilty of violating those disciplinary rules, as well as one other.[2] The trial panel suspended the accused for one year. The accused challenges the foregoing findings of guilt.[3] We review the decision of the trial panel *de novo*. ORS 9.536(2); BR 10.6. For the reasons that follow, we find the accused guilty of the contested charges and suspend him from the practice of law for one year.

The accused joined the Oregon State Bar in 1991 and, at the time of the conduct at issue, was an associate in a Portland law firm. In February 2001, the accused agreed to represent Cosmopolitan Imports, LLC, an import company, in a dispute arising out of the company's contract to purchase a number of August Rodin cast bronze sculptures from Gruppo Mondiale, a Liechtenstein company. McMullen, a friend and former business partner of the accused, owned Cosmopolitan Imports. McMullen also owned a second company, Cosmopolitan Motors, LLC.[4]

---

[1] The Oregon Rules of Professional Conduct became effective January 1, 2005. Because the conduct at issue in this case occurred before that date, we apply the Code of Professional Responsibility.

[2] The trial panel found the accused guilty of three violations of DR 9-101(A) (failing to keep client trust account separate from other accounts). The accused does not contest the trial panel's finding that he committed three violations of DR 9-101(A).

[3] The accused does not separately challenge the trial panel's choice of sanction.

[4] At various points in the record, one could conclude that McMullen, Cosmopolitan Imports, Cosmopolitan Motors, or some combination of the three were the accused's clients. The accused makes no issue respecting the identity of his client in connection with the charges against him, and we do not attempt to sort the matter out further.

Under the contract at issue, Cosmopolitan Imports agreed to deliver three classic cars, which were to be supplied by Cosmopolitan Motors, to Gruppo Mondiale, in exchange for 23 Rodin bronze sculptures. By the time that the accused became involved, Cosmopolitan Imports had received most of the 23 bronzes but had not delivered any of the promised cars.

In March 2001, Gruppo Mondiale filed an action for breach of contract against Cosmopolitan Imports, Cosmopolitan Motors, McMullen, and others, in Washington state. The accused asked Noel, an associate in the law firm's Bellevue office, to assist in the Washington litigation and to serve as attorney of record. At the time, the accused told Noel that Noel need not worry about Cosmopolitan Imports paying the firm's fee, because the firm would have a security interest in some of the bronzes at issue in the litigation. The accused was referring to three bronzes that McMullen had given to the accused to display in the firm's Portland offices, apparently to serve both as a marketing device and as security for his company's mounting legal bills.

In June 2001, relying on an allegation that his import company owed a debt to his motor company, McMullen filed a UCC-1 form with the Washington Department of Licensing giving Cosmopolitan Motors a priority interest in the proceeds from any sale of the 23 bronzes to secure the debt owed by Cosmopolitan Imports. Shortly thereafter, Lewis, a partner at the accused's firm, told the accused that the informal agreement to treat the three bronzes at the firm as security for Cosmopolitan Imports' legal fees should be formalized. Lewis asked another firm partner, Paterson, to negotiate a security agreement. Paterson, in turn, contacted McMullen and had him sign a security agreement on behalf of Cosmopolitan Imports. There is no direct evidence in the record that the accused played any role in the negotiations between Paterson and McMullen.

In the meantime, Gruppo Mondiale's lawyer, Smith, had filed a motion in the superior court in Seattle to compel McMullen and his companies to advise him where the bronzes were located and provide a statement that they

had not been sold or encumbered. Smith also asked the Washington court to enjoin McMullen from selling or encumbering the bronzes in the future. Noel, the attorney of record, discussed the motion with McMullen and the accused and advised both men that, if they intended to perfect a security interest for the law firm in the three bronzes, they should do so before the court ruled on the motion. Within a few weeks, Paterson had filed a UCC-1 form with the Washington Department of Licensing, thereby establishing the law firm's place in the line of priority with respect to the three bronzes displayed in its offices.[5]

The superior court subsequently heard and granted Gruppo Mondiale's motion to compel, enjoined McMullen and his companies from selling or encumbering the 23 bronzes, and ordered him to advise Gruppo Mondiale of the location of the bronzes and whether they had been sold or encumbered. On September 5, 2001, in a declaration that the accused either drafted or discussed with Noel, McMullen certified that the bronzes were encumbered by unspecified perfected security interests and that they were located in six different places in Oregon and Washington, one of which was the law firm's offices.

A few weeks later, McMullen entered into settlement discussions with and ultimately signed a settlement agreement with Gruppo Mondiale. The accused was actively involved in the negotiations, although he claims that McMullen alone was responsible for the final settlement agreement. Under the settlement, (1) Gruppo Mondiale agreed to accept a cash payment from the proceeds of the sale of the bronzes instead of delivery of one of the classic cars; (2) Cosmopolitan Imports granted Gruppo Mondiale a security interest in the bronzes to secure that payment; (3) McMullen agreed to consign and deliver all the bronzes to a gallery for sale within 30 days and warranted that all but two of the bronzes were within his possession or control (the two that he excepted had not yet been shipped by Gruppo Mondiale); and (4) McMullen warranted that the bronzes were free from encumbrances except as listed in the

---

[5] We attempt here to reflect the subjective beliefs and assertions of the various parties (including the accused) who provided evidence. We do not, however, vouch for the accuracy of any participant's assertions.

settlement agreement. Notably, the settlement agreement did not disclose the law firm's perfected security interest in the three bronzes in its offices. McMullen subsequently delivered all the bronzes, except the three at the law firm's offices, to a gallery in Kirkland, Washington.

Gruppo Mondiale did not become aware that the law firm's three bronzes had not been delivered to the gallery until November 2001, when Smith became concerned about whether Cosmopolitan Imports had complied with the parties' settlement agreement. He filed a demand for arbitration in accordance with an arbitration provision in the settlement agreement and moved for partial summary judgment in that arbitration. The summary judgment motion raised, among other things, the issues whether the bronzes had been delivered to a gallery for sale and whether (and what) encumbrances on the bronzes existed prior to the settlement agreement. The accused filed a response to the summary judgment motion that did not address those two issues. However, the accused contemporaneously wrote a letter to Smith stating that "the casts are presently with the O'Day Bronze Gallery in Kirkland Washington. * * *. It is where all the bronzes are currently consigned." That statement was false; three of the bronzes were in the law firm's Portland offices.

On January 18, 2002, the arbitrator issued an order resolving the parties' various motions. The order required McMullen and his companies to disclose and document all encumbrances on the bronzes and to deliver all the bronzes to a gallery for sale within a specified period of time. On January 23, 2002, Smith e-mailed the accused, again inquiring about the security interests in the bronzes. The accused replied, also by e-mail, "We are unaware of any claimed security interests, although both [the law firm] and [another entity] probably claim a lien for any unpaid fees, but clearly any such claim is junior to that of Gruppo Mondiale." In other e-mails at around the same time, the accused represented to Smith that the bronzes "have already been delivered to the O'Day Bronze Gallery" and are "currently displayed at the O'Day Bronze Gallery in Kirkland."

Smith then e-mailed the accused asking for a written receipt from the gallery "listing all of the bronzes that it

has received." A few weeks later, Smith visited the gallery and noticed that not all the bronzes that he expected to see were on display. Smith made some inquiries and the gallery's owner confirmed that all the bronzes that had been delivered to him were on display.

Based on what he had learned, on March 11, 2002, Smith filed a motion with the arbitrator for a determination of contempt and imposition of sanctions against McMullen and Cosmopolitan Imports. When the accused received a copy of the motion, he wrote to the arbitrator stating that, "with the exception of four pieces, all of the bronzes have been consigned with the O'Day Gallery. Three pieces that have not been consigned are displayed in my offices with the full knowledge and consent of Mr. Smith." The accused then shipped the three bronzes from the law firm's offices to the O'Day Gallery and sent a letter to Smith informing him of that action.

On April 1, 2002, Smith wrote to the accused advising him that the accused's statement to the arbitrator regarding Smith's "full knowledge and consent" was false and warning him against repeating it. In spite of that warning, the accused filed a sworn declaration with the arbitrator on April 8, 2002, asserting that "it was my understanding and belief that Mr. Smith and his client were aware that three of the bronzes were being displayed in the offices of [the law firm] in Portland."

On May 12, 2002, the arbitrator issued an order finding that McMullen and Cosmopolitan Imports intentionally failed to deliver all the bronzes to the O'Day Gallery, but represented to Gruppo Mondiale that they had delivered all of them. The arbitrator found McMullen and his company to be in contempt and imposed a $19,500 fine.

Smith reported the accused's actions to the Bar. An investigation ensued and the present charges were filed. After a hearing, a trial panel concluded that the accused was guilty of three counts of violating DR 1-102(A)(3) (dishonesty) by (1) affirmatively misstating the whereabouts of the three bronzes and the law firm's security interest in them in his responses to Smith's November 2001 summary judgment motion; (2) falsely representing to Smith that all the bronzes

had been delivered to the O'Day Gallery in his January 2002 e-mails to Smith; and (3) falsely representing to the arbitrator in March and April 2002 that he had understood that the three bronzes had remained at the law firm's offices with Smith's full knowledge and consent. The trial panel also found that the accused had violated DR 7-102 (false statements while representing client's or lawyer's own interests) in his January 2002 statements to Smith and his March and April 2002 statements to the arbitrator; DR 7-106(A) (disregarding ruling of a tribunal), by failing to comply with the arbitrator's order to deliver all the bronzes to a mutually acceptable gallery for sale; DR 1-102(A)(4) (conduct prejudicial to the administration of justice), by failing to do what the arbitrator specifically had ordered respecting the bronzes; and DR 5-101(A) (continuing in employment after conflict of interest arises), by continuing to represent McMullen and his companies after the arbitrator ordered all bronzes—including the three that his law firm held a security interest in—to be delivered to a gallery.[6] Based on those findings, the trial panel concluded that the accused should be suspended from the practice of law for one year.

■    The accused argues that the Bar failed to prove any of the contested charges by clear and convincing evidence. The accused contends that all the charges rely, to some degree, on a finding that he purposefully or knowingly hid the location and status of the three bronzes from Gruppo Mondiale and its lawyer, Smith. The accused argues that that finding is incorrect and that the evidence proves that the opposite was true—that he did not know that the law firm had perfected its prior security interest in the three bronzes and believed that Smith and Gruppo Mondiale understood all along that the bronzes were at the law firm's Portland offices. The accused acknowledges that "there are facts and circumstances that could be construed to support th[e trial panel's] finding" to the contrary but argues that, "when each of those facts and circumstances is examined in its proper

---

[6] As noted, the trial panel also found that the accused had violated DR 9-101(A) (failing to keep client trust account separate) in an unrelated matter: After leaving the law firm in May 2002, the accused set up his own law firm and client trust account and used his trust account as a personal checking account on at least three occasions. The accused never has contested that charge.

context, and considering the parties' motivations, objectives and credibility[,] the record does not support a finding that the [accused] had [such a] subjective belief."

The accused contends that the trial panel's conclusions that the accused knowingly and dishonestly failed to disclose the fact of his law firm's security interest in the three bronzes rests on an assumption that the accused knew that his firm's security interest in the bronzes had been perfected. The accused contends that that assumption is erroneous—that the evidence supports his claim that he did not know that the security interest had been perfected. He points to his own "consistent" testimony (as he characterizes it) to the effect that, "after initially discussing the prospect of a lien with his managing partner, the matter was placed in the hands of the firm's creditor rights partner and the [accused] had no further involvement with the matter." Indeed, he asserts that he could not reasonably have been expected to have anything further to do with that aspect of his firm's business. He also argues that he did not participate directly in any misrepresentations that were included in the settlement agreement because McMullen and Gruppo Mondiale's principal dealt with each other directly.

None of the accused's arguments is persuasive. Even if no one told the accused exactly when the firm's security interest in the bronzes was perfected, he knew that another employee of the firm had set the process in motion, that time was vital, and that there was no reason to believe that that employee would be unsuccessful. In fact, one partner in the accused's firm testified that he had told the accused to "work with * * * Paterson to get the security interest perfected and done properly." Given that sequence of events, we do not credit the accused's testimony that he was unaware of a perfected security interest when he signed off on the settlement agreement indicating that no one had priority interests in any of the bronzes. Contrary to the accused's assertions, we find by clear and convincing evidence that the accused had knowledge of the firm's security interest in the bronzes.

The accused also argues that the trial panel's conclusions of wrongdoing were based on the incorrect assumption

that the accused was motivated to engage in a series of misrepresentations by a desire to protect his job—specifically, by a desire to reassure the partnership that, although he had invested several months of the firm's time in the Cosmopolitan Imports matter and Cosmopolitan Imports had not yet paid any of its bills, the bills were as good as paid because the firm had the bronzes. He contends that the record establishes that that motive did not exist because, before any of the alleged misrepresentations were made, the accused already had decided to leave the law firm and embark on a solo practice. He argues:

"All that can be stated with any certainty is that the decision was made sometime between January 1, 2002 and March 8, 2002. That calls into question why the [accused] would have made material misrepresentations to [Smith] on January 10, 2002, January 23, 2002, and January 28, 2002. * * * More importantly, the critical representation at issue, that [the accused] made in a sworn affidavit to the arbitrator, was made after the [accused's] email to all of the attorneys and staff at [the law firm] announcing his resignation."

The accused's argument is not persuasive. It is true that the trial panel *did* suggest that the accused was motivated to misrepresent the location and status of the bronzes because he was torn between a personal identification with his friend's contract dispute with Gruppo Mondiale and pressure to perform at his firm (including pressure to ensure collection of the Cosmopolitan bill), and the evidence certainly permits that inference. But that suggestion of divided loyalties is irrelevant: Regardless of the accused's motivations, it remains clear to us that the accused knew the true state of affairs respecting the location of the bronzes and the firm's security interest in them. The accused's claim of a prior decision to leave the firm does not detract from the trial panel's conclusion—with which we agree—that the accused knowingly misrepresented the status and location of the three bronzes to opposing counsel and the arbitrator.

The accused also argues that the evidence shows that his subjective belief about Smith's knowledge of the location and status of the bronzes was correct. The accused suggests, first, that there is "no dispute" that, as of October 2001,

Smith knew that there were a few bronzes at the offices of the law firm. He then goes on to note that, although Smith went to the O'Day gallery on February 6, 2002, and learned that not all the bronzes were on display, and although the parties were engaged in settlement discussions over the next few weeks, Smith never mentioned the missing bronzes to the accused and instead simply filed a contempt motion on March 11, 2002. The accused suggests that that sequence of events "lends credibility" to his position that Smith knew where the bronzes were and was essentially setting him up for a fall.

That argument is not persuasive. It is true that there is evidence that Smith knew that some of the bronzes were at the law firm's Portland offices in early October: McMullen had signed a declaration stating that the bronzes were in several different locations, including the firm offices. But, within a few weeks, McMullen also had signed an agreement promising to send all the bronzes to a gallery for sale by a specified date. There is no persuasive evidence anywhere in the record suggesting that McMullen or the accused somehow had conveyed to anyone that the law firm's three bronzes would be exempt from that promise. Neither does the fact that Smith refrained from asking about the missing bronzes during subsequent settlement discussions in any way suggest that he knew where they were. All that Smith needed to know was that the accused had not produced an itemized consignment agreement in spite of Smith's repeated requests and that not all the bronzes were at the gallery that the parties had agreed upon. That was a sufficient justification for Smith to act as he did.

■ We find the accused guilty of the charged offenses. Respecting sanction, we note that the accused agrees with the Bar that the sanction chosen by the trial panel—a one-year suspension—is an appropriate one if the alleged violations are sustained. Having concluded that the accused is guilty of the violations alleged, we agree with the parties and the trial panel that a one-year suspension is appropriate. A further discussion of that topic would not, in our view, aid the parties, the public, bench, or bar.

The accused is suspended from the practice of law for one year, effective 60 days from the date of this decision.